UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KIMBERLY SALADINO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. _____ |
| | ) |
| BARNSTABLE COUNTY | ) |
| SHERIFF'S OFFICE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF KIMBERLY SALADINO'S COMPLAINT AND JURY DEMAND

### Introduction

1.    The Plaintiff, Kimberly Saladino ("Ms. Saladino" or "Plaintiff") hereby brings this complaint against Defendant Barnstable County Sheriff's Office ("BCSO" or "Defendant") for discrimination and retaliation against Ms. Saladino in violation of M.G.L. ch. 151B and Title VII resulting in her unlawful termination and ensuing damages. As fully set forth below, Ms. Saladino was a highly decorated and respected eighteen-year BCSO employee when she transferred into BCSO's Bureau of Criminal Investigations, led by First Assistant Criminal Identification Officer Matthew Smith ("First Assistant Smith").  From the start, First Assistant Smith treated her differently and was hostile to her on account of her gender as the only female Criminal Identification Officer in his unit.  For months, she verbally complained to BCSO's human resources department about First Assistant Smith as her supervisor because of the disparate and hostile treatment she was being subjected to.  When no action was taken to correct these problems, she was forced to file a written complaint about First Assistant Smith with BCSO.  After a cursory investigation, BCSO's investigator concluded that First Assistant Smith had not violated any of

BCSO's Policies and Procedures. Ms. Saladino was placed on administrative leave shortly after the report was issued and then she was terminated without cause or explanation.  Her termination occurred only a week after the report was issued 'exonerating' First Assistant Smith and barely two months after she made her written complaint against him.

2.      This unlawful termination has destroyed Ms. Saladino's career and upended her life after she fought for decades through a male-dominated industry to become a highly successful and respected member of law enforcement. Her accomplishments and career ended because a male supervisor discriminated against her and then her employer retaliated against her for engaging in protected activity by complaining about such discrimination. Ms. Saladino is a single mother and sole provider for her family, including a child with significant medical needs and her elderly mother with significant medical issues.  Ms. Saladino was hospitalized after her termination due to the emotional distress she endured from her sudden termination, and she continues to suffer profound emotional distress daily. Ms. Saladino seeks to recover for the harm caused her, which includes, without limitation, her destroyed career, lost wages, employment benefits, emotional distress and harm to her reputation.

**Parties**

3.      Plaintiff Ms. Saladino is an individual who resides at 68 Elijah Childs Lane, Centerville, Massachusetts 02632.

4.      Defendant Barnstable County Sheriff's Office maintains its principal office at 6000 Sheriff's Place, Bourne, Massachusetts 02532.

**Venue and Jurisdiction**

5.      Jurisdiction is proper because this matter arises, in part, under federal law, Title VII of the Civil Rights Act of 1964.

6.      Venue is proper as Plaintiff resides in Centerville, Barnstable County, Massachusetts and the events giving rise to this claim took place in the Commonwealth of Massachusetts.

**Facts**

*Ms. Saladino's Background and Pre-2022 Employment at BCSO*

7.      Ms. Saladino has been employed continuously with the BCSO since 2005 after she graduated from the BCSO Correctional Officer Academy in 2005.

8.      Ms. Saladino was assigned to work as a Corrections Officer in the Barnstable County Correctional Facility starting in 2005. During this time, Ms. Saladino took an interest in identifying gangs and gang members in Barnstable County.  In order to further educate herself in this and other areas relevant to law enforcement, Ms. Saladino attended various trainings across the country and received approximately one thousand hours of training.  Ms. Saladino paid for a majority of these trainings out of her own pocket and during her free time.

9.      With this specialized training, Ms. Saladino became the go-to employee at BCSO for identifying gang members at the Barnstable County Correctional Facility and on Cape Cod. Part of her work included intelligence gathering and sharing on gang activity.

10.     Ms. Saladino always went above and beyond with her job. She frequently attended extra training so she was prepared.  Ms. Saladino received the "Perfect Attendance Award" since 2011 up through her unlawful termination. Between 2010 and 2022, Ms. Saladino was required to attend 520 total hours of training (40 per year) as part of her employment.  During this period, Ms. Saladino sought and obtained 1,777 total hours of training: more than three times the required hours.

11.     Ms. Saladino was deputized by (former) Barnstable County Sheriff James Cummings ("Sheriff Cummings") on November 8, 2007.

12.     Ms. Saladino performed well and was recognized for her performance. In June 2008, Ms. Saladino received the "Member of the Year Award" from the Massachusetts Association of Women in Law Enforcement for her dedication and commitment to women in law enforcement.

13.     In May 2010, Ms. Saladino was honored for her acts of bravery and heroism at BCSO at the 2010 "Correctional Employee of the Year" Award Ceremony.

14.     In March 2011, Ms. Saladino began teaching gang resistance and education training (GREAT) in the Mashpee, Massachusetts school system in a course that was funded by the United States Department of Justice.

15.     In May 2011, because of Ms. Saladino's knowledge and skill investigating gang members, the Barnstable Police Department ("BPD") requested her assignment to BPD's Street Crimes Unit ("SCU"), where she then transferred. The SCU was a multi-agency street crime unit that included BPD, Mashpee Police Department, Yarmouth Police Department, Massachusetts State Police, BCSO and the Cape and Island District Attorney's Office. The SCU focused on violent crimes, prostitution and open-air narcotics on Cape Cod. The SCU was recognized for its immediate impact on crime on the Cape and given the Red Cross Heroes Award in 2012.

16.     Ms. Saladino's knowledge of gangs and identification skills eventually became well known at the state and federal level. Ms. Saladino singlehandedly developed a notification system that notified BCSO whenever a known gang member became an inmate at Barnstable County Correctional Facility. Local police departments on the Cape learned about this notification system and requested access.  Eventually the notification system grew and began to be used by the Commonwealth of Massachusetts Department of Correction ("DOC") and district attorneys'

offices in Norfolk County, Bristol County, Plymouth County and Barnstable County. Ms. Saladino also drafted a Memorandum of Understanding with the DOC to allow reciprocal access to its notification and phone systems.

17.    Throughout her tenure at BCSO, Ms. Saladino frequently worked in partnership with other state and federal law enforcement agencies. For example, Ms. Saladino's investigation skills were tapped in a joint federal and state investigation that focused on the Nauti-Block gang in Hyannis, Massachusetts. Ms. Saladino worked in conjunction with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives and spent countless hours listening to wiretaps in order to provide crucial gang intelligence. Her work contributed to the arrests of nineteen Nauti-Block gang members and associates, including the murder conviction of the gang leader who was ultimately sentenced to 28.5 years in federal prison.[1] Ms. Saladino separately identified a DOC inmate in possession of a cellular device while in custody causing an on and after federal sentence.

18.    BPD's Deputy Chief at one point referred to Ms. Saladino as a "walking wiretap."

19.    In 2014, Ms. Saladino was promoted to Sergeant in the BCSO and also was specifically requested by the Cape and Islands District Attorneys' office to remain assigned to the Barnstable Police Department's Street Crime Unit.

20.    Around 2017, BPD's Street Crimes Unit disbanded, and Ms. Saladino was assigned to the Falmouth Police Department's detectives' unit.

---

[1] The following are a sample of cases Ms. Saladino contributed to prior to her assignment at BCI: https://www.capecod.com/cape-wide-news/hyannis-man-sentenced-to-2-12-years-for-illegal-firearm/; https://www.capecod.com/newscenter/zinov-to-remain-behind-bars/; https://www.wickedlocal.com/story/register/2013/12/10/centerville-man-held-on-1/38015958007/ https://www.justice.gov/usao-ma/pr/cape-cod-man-sentenced-distributing-suboxone-prison; https://hyannisnews.com/in-short-he-has-been-a-very-bad-ant-tons-of-video-hyannis-news-anthony-russ-barnstable-cape-cod/; https://www.capecodtimes.com/story/news/2013/07/22/yarmouth-man-faces-drug-charges/44526340007/; https://www.justice.gov/usao-ma/pr/member-brockton-based-drug-trafficking-organization-sentenced-19-years-prison; https://www.justice.gov/usao-ma/pr/barnstable-man-charged-firearm-trafficking.

21.    Not long after her assignment to Falmouth, BPD requested that Sheriff Cummings reassign her back to BPD to work in its narcotics unit, where she then transferred and worked successfully until 2022.

22.    Ms. Saladino's supervisor at BPD reported to the former Sheriff Cummings that he was "happy" with Ms. Saladino's job performance when she was assigned to BPD.

23.    Ms. Saladino's knowledge of gangs, ability to utilize social media and other technology to enhance her job duties made her an asset to BPD and other police departments.

24.    Ms. Saladino excelled in her law enforcement work.  For the years 2014, 2015, 2016, 2017, 2018, 2019, 2020, and 2021, Ms. Saladino received the highest possible Employee Performance Evaluation, a "10".  BCSO did not employ a numerical ranking system prior to 2014.

25.    In April 2017, Mickey D. Leadingham, Special Agent in Charge of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, wrote to then-Sheriff Cummings commending Ms. Saladino for her assistance in an Organized Crime Drug Enforcement Task Force Title III investigation.

26.    In March 2019, Patrick DePalo, Chief of the Massachusetts Department of Correction–Office of Investigative Services, sent then-Sheriff Cummings a letter of commendation recognizing Ms. Saladino for her help in apprehending a fugitive.

27.    In May 2020, Ms. Saladino was recognized by BPD's Chief Sonnabend for her hard work, professionalism and commitment to BPD through training recruits during the COVID-19 shutdowns.

28.    In April 2022, the BPD's narcotics unit disbanded and Ms. Saladino needed a new assignment.

29.    Ms. Saladino did not have any disciplinary issues throughout the years that she reported directly to Sheriff Cummings.

30.    Sheriff Cummings described Ms. Saladino as excelling at intelligence gathering.

### *Ms. Saladino's Assignment to BCI*

31.    Ms. Saladino and Sheriff Cummings met in April 2022. She was told she could either work the midnight shift as a Sergeant at the BCSO's correctional facility and wait for the next promotion to Lieutenant, which was not possible for her at that time given her family responsibilities and obligations, or give up her rank and be assigned to BCSO's Bureau of Criminal Identification ("BCI"). Upon information and belief, there are no standard rankings such as Sergeant, Lieutenant or Captain at BCI.

32.    Because of her interest and experience in investigative work which she had been doing in different capacities for years and her need for a schedule other than the overnight schedule due to her family responsibilities, she transferred to BCI.

33.    Sheriff Cummings did not have any concerns assigning Ms. Saladino to BCI. He thought Ms. Saladino would be a benefit to BCI due to her background.

34.    Sheriff Cummings decided Ms. Saladino's salary when she was transferred to BCI.

35.    Ms. Saladino began at BCI as a Criminal Identification Officer ("CIO") in May 2022.

36.    Per BCSO's website:

> Criminal Identification Officers (CIOs) are responsible for the collection and security of all physical evidence collected at crime scenes they process across Cape Cod. At the request of our local police departments, federal and state law enforcement, BCSO CIOs photograph and document crime scenes, processing for latent prints and physical evidence. Our CIOs, many of whom are former police officers, are trained in forensic disciplines such as latent fingerprint comparison, photography, DNA collection, crime scene investigations and other highly specialized disciplines enabling them to take

7

charge of crime scene evidence. Often called upon to testify in court, CIOs are expertly trained to comply with industry standards in evidence collection, comparison and identification.

37.     At the time of her transfer, Ms. Saladino was informed by former Sheriff Cummings that this was a lateral transfer within the BCSO.  Her transfer did not result in a downgrade and/or upgrade in her position or status at BCSO.  She was told her salary would be the same, and it was.

38.     No one informed Ms. Saladino that she would be put on a one-year probationary period after she transferred to BCI.

39.     Sheriff Cummings confirmed that Ms. Saladino was not placed on any probationary status when she transferred to BCI because she had been a BCSO employee for over ten years.

40.     Ms. Saladino was the only female CIO at BCI from the time she started in May 2022 until she was terminated in May 2023.

41.     Ms. Saladino was initially assigned to work at BCI Monday-Friday, 7:00 am – 3:00 pm, with no overtime or holiday pay scheduled, until January 2023 when she worked 7:00 am – 3:00 pm on a rotating "four and two" schedule where she worked four days on and then had two days off.

42.     Ms. Saladino was informed that she would receive certain training upon transferring to BCI, but that she would also rely on her prior training and experience at BCSO to perform her duties as a CIO.

43.     After a new CIO is hired, they are also supposed to receive critical on-the-job training working with other CIOs. This on-the-job training includes going to crime scenes with other more experienced CIOs to observe.

44.     Ms. Saladino approached her new assignment at BCI with significant enthusiasm.

8

45.    Despite this, it became apparent to her soon after she arrived that First Assistant Smith held a discriminatory animus against Ms. Saladino based on her gender.  On information and belief, he had already decided he would do whatever was necessary to force her out.

***First Assistant Smith's Bias Against Ms. Saladino Before She Even Transferred to BCI***

46.    Ms. Saladino reported to First Assistant Smith, a member of BCSO's Executive Staff.  Pursuant to BCSO's Policy and Procedure Number 201.01, "[s]upervisors are held to a higher standard of conduct.  Supervisors are expected to be role models[.]"

47.    Ms. Saladino did not have a professional working relationship with First Assistant Smith prior to her transfer to BCI.  They knew each other through their mutual employment at BCSO but had not worked directly together. During the independent investigation into Ms. Saladino's complaint against First Assistant Smith, he claimed that he had "no idea what prior positions CIO Saladino held before she came to BCI… [and] denied having any prior resentment against her because of her arrival path to the BCI." Upon information and belief, First Assistant Smith in fact was well aware of Ms. Saladino's background and prior positions at BCSO and resented her because former Sheriff Cummings and others held her in high regard.

48.    Prior to Ms. Saladino's transfer to BCI, First Assistant Smith, verbally and via text message, voiced his animosity and resentment toward her to BCSO's Special Sherriff Ross Alper ("Special Sheriff Alper").

49.    First Assistant Smith texted the following to Special Sheriff Alper on May 3, 2022:

> "I know I said it, but I have to reiterate it again, I am just baffled how this is not looked at as an opportunity for everyone to win. Move Kim to BCI and solve your problem with her, move Jason Molino up to Director and move me to ADS. I can stay at BCI to mentor Jason and it is a win win win for everybody. Except now, for unknown reasons that's not what happens….**it's merely, "let's bend over backwards for Kim**[.]" As I also said, I take orders and I will obediently abide by them, **but please just have**

9

**it be known that as I'm sure you've seen, I am extremely, extremely unhappy**."

*Exhibit 1* (emphasis added).

50.     Upon information and belief, First Assistant Smith did not receive the promotion to ADS, which added to his hostility towards Ms. Saladino.

51.     Upon information and belief, First Assistant Smith was also upset that Ms. Saladino did not have to undergo a formal interview with First Assistant Smith prior to her transfer to BCI and was instead directly assigned to BCI by former Sheriff Cummings, who had been his boss at the time of her transfer. First Assistant Smith had mostly selected men to work at BCI. He made it clear to her over time that he objected to her transfer into his unit in the hostile manner that he treated her.

52.     Upon information and belief, in May 2022 prior to Ms. Saladino's arrival at BCI, First Assistant Smith stayed after his scheduled shift that day at BCI and he told one or more BCI employees during the shift change, "we have to [expletive] get rid of her" in reference to Ms. Saladino.

### First Assistant Smith Began Singling Out Ms. Saladino Because of Her Gender

53.     Ms. Saladino submitted her written reports and photographs to another one of her supervisors, CIO Molino, prior to a final review by First Assistant Smith. Apart from miniscule issues, i.e. typographical errors, CIO Molino informed Ms. Saladino her reports and photographs were appropriate.

54.     First Assistant Smith, however, intervened and would routinely send back the same reports that CIO Molino had reviewed and approved with unwarranted criticisms and instructions that Ms. Saladino make further revisions. On multiple occasions, First Assistant Smith accused

10

her of not writing reports, even though the same reports had already been reviewed and approved by First Assistant Smith.

55. First Assistant Smith acknowledged to BSCO's Human Resources that a CIO becomes proficient through experience, but repeatedly denied Ms. Saladino the necessary experience to gain such proficiency.

56. Ms. Saladino soon became aware that First Assistant Smith would excessively scrutinize and critique her work while not providing the same level of scrutiny and critique to other male CIOs.

57. First Assistant Smith was often verbally abusive to Ms. Saladino by telling her that all of her work was "horrible" and that every other CIO (all males except for her) "gets it."

58. On another occasion, First Assistant Smith informed Ms. Saladino that her perfume was "offensive" to the office and she needed to make a change.

59. Despite First Assistant Smith's repeated unwarranted criticisms, Ms. Saladino did not receive any written performance evaluations during the year she worked at BCI, nor was she placed on any performance improvement plans.

60. After receiving some training, Ms. Saladino was permitted to attend calls on her own in the beginning of January 2023, establishing that she was performing her job duties at an acceptable level.

61. First Assistant Smith also began assigning practice proficiency tests to Ms. Saladino.

62. These proficiency tests were not officially part of a CIO's job-performance or a tool used to measure employment decisions at BSCO.

11

63.    First Assistant Smith began using practice tests as a way to force Ms. Saladino out. Ms. Saladino received two "practice" tests in a span of less than three months.

64.    First Assistant Smith made the proficiency test a condition of Ms. Saladino's employment, which, upon information and belief, was not how he treated other new CIOs.

### First Assistant Smith's Denial of Ms. Saladino's Training Opportunities That Were Offered Instead to Male Employees

65.    Prior to Ms. Saladino's transfer to BCI in April 2022, she requested and was approved to attend, and did attend, the first installment of the FBI-LEEDA, Inc. ("FBI-LEEDA") training in Hyannis, Massachusetts that included three overall installments.

66.    After Ms. Saladino transferred to BCI, she filed a request to attend the second installment of the FBI-LEEDA training.

67.    First Assistant Smith oversaw and approved all training requests from CIOs.

68.    First Assistant Smith denied Ms. Saladino's request to attend the second installment of the FBI-LEEDA training.

69.    Upon information and belief, First Assistant Smith and another male employee— after First Assistant Smith denied Ms. Saladino's request—attended and completed the FBI-LEEDA training while Ms. Saladino was working at BCI.

70.    Ms. Saladino was denied this important training opportunity by her male superior so he and another male could attend.

71.    First Assistant Smith denied her other opportunities that he allowed his male subordinates. At some point in 2022, Ms. Saladino was asked by a local school on the Cape to give a presentation about her career and what it is like to be a woman in law enforcement.

72.    Ms. Saladino relayed this opportunity to one of her supervisors, CIO Molino. CIO Molino informed Ms. Saladino that he asked First Assistant Smith if Ms. Saladino had permission to conduct the presentation and First Assistant Smith was thinking it over.

73.    Ms. Saladino followed up with First Assistant Smith approximately one week later and First Assistant Smith vaguely informed Ms. Saladino that he needed to look at BCI's calendar to see if there were any available times.

74.    First Assistant Smith ultimately ignored Ms. Saladino and never got back to her about this opportunity.

75.    Upon information and belief, other males at BCI were permitted to give talks to local schools without objection from First Assistant Smith, but the only female CIO—Ms. Saladino—was denied the same opportunity.

### *Ms. Saladino's Complaints to BCSO's Human Resource Department*

76.    On or about January 20, 2023, Ms. Saladino met with BCSO's Chief of Human Resources and Organizational Culture Colleen Wooding ("Chief of HROC Wooding") where Ms. Saladino verbally complained and reported that she felt First Assistant Smith was bullying and harassing her, as well as creating a hostile work environment because of her gender.

77.    Ms. Saladino also reported that she was not sleeping, had lost approximately forty pounds due to stress since she started working at BCI, her hair was falling out, and seeing First Assistant Smith's personal vehicle when she arrived at work every day caused her extreme anxiety.

78.    Upon information and belief, Chief of HROC Wooding took no action in response to Ms. Saladino's January 2023 complaint.

79.    On or about February 13, 2023, Ms. Saladino met with Chief of HROC Wooding again and relayed the same concerns and that nothing had changed with First Assistant Smith.

80.     Upon information and belief, Chief of HROC Wooding took no action in response to Ms. Saladino's February 2023 complaint.

81.     On or about March 1, 2023, Ms. Saladino filed a formal written complaint against First Assistant Smith through BCSO's "Professional Conduct Report Form" ("Written Complaint"). *Exhibit 2*.

82.     Two days after her written complaint against him, First Assistant Smith wrote a two-page email to Chief of HROC Wooding criticizing Ms. Saladino's job performance. This was in retaliation for her written complaint against First Assistant Smith.

83.     Ms. Saladino's Written Complaint was clear in that during her time at BCI, First Assistant Smith subjected her to:

- Ongoing bullying/hostile work environment;
- Excessive performance monitoring;
- Singling out;
- Intimidation;
- Humiliation;
- Wrongful blame/work sabotage;
- Lying about co-worker[s] going to him about her;
- Not allowing her to ask for help/telling her she did not need training;
- Belittling; and
- Disparate treatment.

84.     First Assistant Smith's bullying of Ms. Saladino and creation of a hostile work environment eventually made Ms. Saladino's working environment intolerable. She felt so intimidated as a result of First Assistant Smith's treatment that she could no longer ask him questions surrounding her job duties. She experienced high stress just coming to work because of First Assistant Smith's harassment and bullying.

14

85.    In response to Ms. Saladino's Written Complaint, BCSO engaged Regina Ryan, Esq. of Discrimination and Harassment Solutions, LLC ("Investigator Ryan") to conduct an internal investigation.

### Investigator Ryan's Investigation and Findings of Fact

86.    Investigator Ryan conducted five interviews—including of Ms. Saladino—prior to issuing her Findings of Fact and Conclusion on April 20, 2023.

87.    Investigator Ryan only met with Ms. Saladino one time.

88.    First Assistant Smith remained as Ms. Saladino's direct supervisor while Investigator Ryan conducted her investigation.

89.    Investigator Ryan did not interview Special Sheriff Alper, who possessed information supporting Ms. Saladino's claims. Ms. Saladino specifically asked Investigator Ryan to interview Special Sheriff Alper, to no avail.

90.    During the investigation, among other things, Ms. Saladino informed Investigator Ryan that First Assistant Smith treated her differently because she was a female.

91.    Investigator Ryan also interviewed First Assistant Smith and three other BCI employees.

92.    The scope of her investigation was only to determine whether First Assistant Smith violated any of BCSO's Policies and Procedures.

93.    Ultimately, Investigator Ryan concluded that First Assistant Smith did not violate any of BCSO's Policies and Procedures.

94.    Incredibly less than a week after Investigator Ryan's report was concluded, *Ms. Saladino* was placed on administrative leave, and not First Assistant Smith.

*Ms. Saladino's Termination*

95.     BCSO's Policy and Procedure Number 201.01 states, in part:

**<u>No Retaliation</u>**

No employee shall be retaliated against for filing such a claim or for their participation in the investigation into a complaint under this policy.  All employees and individuals covered by this policy are required to fully participate in any investigation. No employee shall encourage another employee or anyone else to take any retaliatory action against anyone who files a complaint or participates in an investigation. Anyone committing or supporting retaliation shall face discipline up to and including termination.

(emphasis in original).

96.     On or about May 3, 2023, Ms. Saladino received a telephone call from BCSO requesting that Ms. Saladino come to BCSO's office the next day, May 4, 2023, to go over a few things.

97.      On or about May 4, 2023, Ms. Saladino arrived at BCSO's office and met with Chief of HROC Wooding. BCSO's Special Sheriff Robert Ahonen was also present at this meeting.

98.     Chief of HROC Wooding informed Ms. Saladino that Investigator Ryan's investigation revealed that First Assistant Smith "did nothing wrong" and did not violate any BCSO policies.

99.     Chief of HROC Wooding then informed Ms. Saladino that she was being terminated, but did not give specific reasons.

100.    Chief of HROC Wooding then informed Ms. Saladino that if she signed a Severance Agreement and General Release and Waiver of Claims ("Severance Agreement") and resigned, Ms. Saladino would get a severance package of nineteen weeks of pay. The paperwork

16

was already prepared and waiting for Ms. Saladino's signature and there was no opportunity for her to consult with counsel.

101.    Ms. Saladino asked what would happen if she did not sign the paperwork that day, and Chief of HROC Wooding informed her that BCSO would move for immediate termination and that Chief of HROC Wooding needed an immediate answer.

102.    Ms. Saladino declined to sign the Severance Agreement and was officially terminated. *Exhibit 3*.

103.    Based on the feedback Ms. Saladino received from her superiors at BCSO—after her promotion to Sergeant in 2014—she had a strong chance to become Lieutenant and likely other future promotions at BCSO that would have included increased compensation and other employment benefits, which she was deprived due to the discrimination, hostility and retaliation she was subjected to at BCSO and her unlawful termination.

### *Ms. Saladino's Mental and Physical Health Fails After Her Unlawful Termination*

104.    Ms. Saladino was shocked and deeply distressed by her sudden termination, without lawful reason or justification.  The distress was exacerbated because she is a single mother and one of her children has a significant medical condition.  One month to the day after her unlawful termination, due to the ongoing stress and shock from her termination, Ms. Saladino collapsed at home and was transported to the hospital.

105.    Ms. Saladino was diagnosed with certain infections and her treating providers informed her that her body was dangerously compromised due to stress.

106.    After her unlawful termination and due to the stress from her time at BCI and her termination, she was diagnosed—for the first time and as a direct result of her employment at BCI—with anxiety and was prescribed new and additional medication.

17

107.    To make matters worse, Ms. Saladino's health insurance was cancelled after her termination, precluding her from maintaining the same coverage she had. This health insurance was vital to not only Ms. Saladino's health, but also one of her sons.

108.    Ms. Saladino had to obtain different health insurance after her termination. The new health insurance does not provide the same type of coverage that she previously had, and it requires increased premiums and co-pays. This has adversely impacted Ms. Saladino and her son.

109.    Ms. Saladino's other son also had to drop out of college because Ms. Saladino could not provide financial assistance after she was unlawfully terminated.

### *Exhaustion of Administrative Remedies*

110.    Ms. Saladino timely filed a Charge with the Massachusetts Commission Against Discrimination and Equal Employment Opportunity Commission concerning the above on November 13, 2023.

111.    Plaintiff withdrew her Charge from the Massachusetts Commission Against Discrimination and Equal Employment Opportunity Commission on May 2, 2024.

**Count I**
**Violation of M.G.L. c. 151B, § 4**
**Discriminatory Treatment/Hostile Work Environment**

112.    Plaintiff repeats and incorporates each of the above paragraphs.

113.    Plaintiff is a member of a protected class due to her gender.

114.    At all relevant times, Plaintiff was qualified to and did perform the essential functions of her job.

115.    Plaintiff experienced discriminatory treatment because of her gender, including, but not limited to, discriminatory scrutiny, disparate treatment, sidelining her from her role, not

allowing her to speak in public schools while male employees were allowed to, and denial of training opportunities that were taken by male employees instead.

116. Plaintiff experienced a hostile work environment based on her gender, as discussed above. The treatment of Plaintiff due to her gender was humiliating and extremely harmful.

117. The discriminatory treatment led to adverse employment actions, including but not limited to Ms. Saladino's termination, and caused substantial emotional distress.

118. First Assistant Smith was Plaintiff's supervisor, and thus BCSO is strictly liable for his conduct.

119. As a result of Defendant's unlawful conduct, Plaintiff suffered harm, including but not limited to lost opportunities for career advancement, reduced compensation, diminished reputation and emotional distress, and is entitled to recover punitive damages, costs, reasonable attorney's fees, and interest.

**Count II**
**Violation of Title VII**
**Discriminatory Treatment/Hostile Work Environment**

120. Plaintiff repeats and incorporates each of the above paragraphs.

121. Plaintiff is a member of a protected class due to her sex/gender.

122. At all relevant times, Plaintiff was qualified to and did perform the essential functions of her job.

123. Plaintiff experienced discriminatory treatment because of her gender, including, but not limited to, discriminatory scrutiny, disparate treatment, sidelining her from her role, not allowing her to speak in public schools while male employees were allowed to, and denial of training opportunities that were taken by male employees instead.

124.    Plaintiff experienced a hostile work environment based on her gender, as discussed above. The treatment of Plaintiff due to her gender was humiliating and extremely harmful.

125.    The discriminatory treatment led to adverse employment actions, discussed herein and caused substantial emotional distress.

126.    First Assistant Smith was Plaintiff's supervisor, and thus BCSCO is strictly liable for his conduct in violation of Title VII.

127.    As a result of Defendant's unlawful conduct, Plaintiff suffered harm, including but not limited to lost opportunities for career advancement, reduced compensation, diminished reputation and emotional distress, and is entitled to recover punitive damages, costs, reasonable attorney's fees, and interest.

## Count III
## Violation of Title VII
## Retaliation Based on Protected Conduct

128.    Plaintiff repeats and incorporates each of the above paragraphs.

129.    Plaintiff is a member of a protected class due to her gender.

130.    Ms. Saladino engaged in protected conduct by, among other ways, opposing discriminatory conduct against her based on her gender and making oral and written complaints of, among other things, gender discrimination and hostile work environment.

131.    Following this protected conduct and as a direct result thereof, Ms. Saladino experienced adverse employment action and retaliation, including but not limited to the termination of her employment at BCSO.

132.    BCSO's actions have altered the terms of Ms. Saladino's employment, caused substantial emotional distress, harmed her reputation, and limited her ability to succeed within the office and/or progress in her career.

133.     As a result of Defendant's retaliation and unlawful discharge of Ms. Saladino, Plaintiff suffered harm, including but not limited to lost opportunities for career advancement, reduced compensation, diminished reputation and emotional distress, and is entitled to recover punitive damages, costs, reasonable attorney's fees, and interest.

### Count IV
### Violation of M.G.L. ch. 151B
### Retaliation Based on Protected Conduct

134.     Plaintiff repeats and incorporates each of the above paragraphs.

135.     Plaintiff is a member of a protected class due to her gender.

136.     Ms. Saladino engaged in protected conduct by, among other ways, opposing discriminatory conduct against her based on her gender and making oral and written complaints of, among other things, gender discrimination and hostile work environment.

137.     Following this protected conduct and as a direct result thereof, Ms. Saladino experienced adverse employment action and retaliation, including but not limited to the termination of her employment at BCSO.

138.     BCSO's actions have altered the terms of Ms. Saladino's employment, caused substantial emotional distress, harmed her reputation, and limited her ability to succeed within the office and/or progress in her career.

139.     As a result of Defendant's retaliation and unlawful discharge of Ms. Saladino, Plaintiff suffered harm, including but not limited to lost opportunities for career advancement, reduced compensation, diminished reputation and emotional distress, and is entitled to recover punitive damages, costs, reasonable attorney's fees, and interest.

WHEREFORE, Plaintiff Kimberly Saladino respectfully requests that the Court grant her the following relief:

21

(1)     Enter judgment in favor of Plaintiff on all Counts of her Complaint;

(2)     Award Plaintiff damages, including to compensate her for lost wages and benefits, emotional distress, punitive damages and all other recoverable damages;

(3)     Award Plaintiff interest, attorneys' fees and costs; and

(4)     Award such other relief as the Court deems just and equitable.

**Jury Demand**

Plaintiff demands a trial by jury on all counts so triable.

Respectfully submitted,

KIMBERLY SALADINO,

By her Attorneys,

*/s/ Nicholas B. Carter*
*/s/ William E. Gildea*
Nicholas B. Carter, BBO # 561147
William E. Gildea, BBO # 699112
Todd & Weld LLP
One Federal Street
Boston, MA 02110
(617) 720-2626
ncarter@toddweld.com
wgildea@toddweld.com

Dated: July 30, 2024